## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 14-** |
| **v.** | : | **DATE FILED: _____** |
| **FRANK J. MORELLI, III** | : | **VIOLATIONS:** |
| | | **18 U.S.C. § 371 (conspiracy - 1 count)** |
| | : | **18 U.S.C. § 1343 (wire fraud - 1 count)** |
| | | **15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R.** |
| | : | **§ 240.10b-5 (securities fraud - 1 count)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notice of forfeiture** |

## INFORMATION

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

### BACKGROUND

At all times material to this information:

1.      Super Nova Resources, Inc. ("SNRR") was a Delaware corporation with its principal place of business in Winston Salem, North Carolina.  According to its public filings, SNRR had two wholly-owned divisions:  Navicus, which provided employment screening services; and Greenlink Interactive, which purportedly provided video assistance and point-of-decision sales systems ("PODS") on a local, national, or global basis through real-time video technology and an interactive customer service and marketing network.  SNRR's securities were publicly traded on the OTC Link (formerly referred to as the "Pink Sheets") under the symbol "SNRR."

2.     The companies trading on the OTC Link tend to be extremely small, and the stock in those companies tends to be closely held (that is, owned by a small number of individuals) and thinly traded (that is, traded far less frequently than stocks in larger companies on larger exchanges).

3.     Defendant FRANK J. MORELLI, III, was a business consultant who worked for and/or in association with Starr Consulting, Inc. ("Starr Consulting").  Defendant MORELLI held and traded SNRR stock in the names of various family members.

4.     Person Number 1 ("Person No. 1"), known to the United States Attorney, owned, controlled, and/or traded a substantial number of shares of SNRR stock through Azure Seas Ltd. ("Azure Seas"), which according to SNRR's public filings, owned 7.6 percent of SNRR's common stock as of May 2009.  Person No. 1 also owned, controlled, and/or traded SNRR stock through Horizon Capital LLC ("Horizon Capital") and Paradise Holdings Ltd. ("Paradise Holdings"), and through various other entities and individuals who acted at his direction, and the direction of his partner, Person No. 2.

5.     Person Number 2 ("Person No. 2"), known to the United States Attorney, owned, controlled, and/or traded a substantial number of shares of SNRR stock through Azure Seas, Horizon Capital, and Paradise Holdings, all of which were entities under his control or influence, and through various other entities and individuals who acted at his direction, and the direction of his partner, Person No. 1.

6.     Person Number 3 ("Person No. 3"), known to the United States Attorney, was a major shareholder of SNRR.  According to SNRR's public filings, Person No. 3 owned 76.3 percent of SNRR's common stock as of May 2009, and he was listed as Chief Executive Officer of SNRR in some company press releases.

2

7.      Person Number 4 ("Person No. 4"), known to the United States Attorney, owned Starr Consulting, Inc., a company located in North Carolina which performed various services for businesses, including consulting services for companies seeking to buy, sell, and promote publicly traded companies and/or their stock.  Person No. 4 was one of the directors of SNRR and is listed in public filings as SNRR's President, Secretary, and Treasurer, and the owner of 7.6 percent of SNRR common stock as of May 2009.

8.      Person Number 5 ("Person No. 5"), known to the United States Attorney, held and traded SNRR stock in his own name and his wife's name.

9.      Person Number 6 ("Person No. 6"), known to the United States Attorney, was associated with Bay State Financial Services Corp. ("Bay State Financial"), a Massachusetts based investor relations firm.  Person No. 6 held and traded SNRR stock in the name of Bay State Financial.

10.     Person Number 7 ("Person No. 7"), known to the United States Attorney, was the host of a business show that aired on radio and television.

11.     Person Number 8 ("Person No. 8"), known to the United States Attorney, worked for Brokerage Firm A.

12.     Person Number 9 ("Person No. 9"), known to the United States Attorney, owned a Philadelphia area investment consulting company.

13.     Person Number 10 ("Person No. 10"), known to the United States Attorney, worked in association with Person No. 4 and Starr Consulting, and prepared paperwork for individuals and entities engaged in the purchase and sale of publicly traded entities and their stock, including SNRR.  Person No. 10 also held and traded SNRR stock in his own name and

3

through Company X, a consulting company that he owned.  In addition, Person No. 10 was the controlling shareholder and/or a director of Company Y, an oil and gas company.

14.     Person Number 11 ("Person No. 11"), known to the United States Attorney, served at various times as the president of SNRR and promoted SNRR in press releases and on business programs hosted by Person No. 7.

15.     An individual known to the United States Attorney and identified here as the cooperating witness (the "CW") was secretly cooperating with the government.  In this capacity, the CW posed as an individual who could facilitate the manipulation of the price and volume of publicly traded shares for a fee.

16.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the OTC Link.  SNRR stock was registered with the SEC.

17.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false or misleading statements and/or the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms and/or transfer agents involved in the purchase and/or sale of stock in companies subject to SEC regulation; and (c) the public.  Federal securities laws and regulations also prohibit the manipulation of stock through, among other things, sales made at the times and/or at prices set by those trading the stock rather than by market forces.

18.     From in or about at least Fall 2008 through in or about October 2009, in the Eastern District of Pennsylvania, and elsewhere, defendant

**FRANK J. MORELLI, III**

together with Person No. 1, Person No. 2, Person No. 3, Person No. 4, Person No. 5, Person No. 6, Person No. 7, Person No. 8, Person No. 9, Person No. 10, and others known and unknown to the United States Attorney, devised and intended to devise, and aided and abetted, a scheme to defraud SNRR shareholders, and to obtain money and property, by means of knowingly false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

19.     Defendant FRANK MORELLI, Person No. 1, Person 2, Person No. 3, Person No. 4, Person No. 5, Person No. 6, Person No. 7, Person No. 8, Person No. 9, Person No. 10, and others known and unknown to the United States Attorney (collectively, the "SNRR Group") planned to obtain money by inflating the volume of trading in and/or the price of SNRR stock through misleading marketing and stock manipulation, and by preventing the SEC from detecting the scheme or taking regulatory enforcement action against them.   In order to do this, the SNRR Group took various actions, including the following:

a.     Obtaining control of SNRR by establishing control over the vast majority of SNRR's shares, so the SNRR Group could control the timing, volume, and price of stock available for trading.

b.     Filing documents with the SEC that contained misleading statements.

5

      c.     Using debt conversion and false and misleading opinion letters to stock transfer agents and brokerage firms to issue free trading SNRR stock so the stock could be used in the scheme.  Federal securities laws and regulations preclude the sale of restricted stock, including stock held or obtained from officers, directors, and controlling shareholders, to the public during the time in which the restrictions are in effect.  Free trading stock is stock that can be sold to the public and, therefore, could be used in the scheme.

      d.     Agreeing to promote SNRR stock by: (1) paying Person No. 7 cash and stock to host a representative of SNRR on his show; and (2) using press releases about SNRR, including press releases that were false and misleading.

      e.     Coordinating the issuance of press releases with pre-planned buying and selling of SNRR stock, sometimes at agreed upon prices, between and among themselves and entities and individuals under their control, in order to increase trading volume, thereby:  (1) creating the false impression to investors that there was market interest in SNRR stock when there was little or no interest in the stock; and (2) limiting scrutiny by the SEC by making it appear that increases in the volume of SNRR stock traded were justified by the press that the company generated.

      f.     Avoiding scrutiny by the SEC by: (1) transferring SNRR stock to nominees under their control in order to disguise the true ownership of the stock; (2) agreeing to use different brokers in order to make it more difficult to detect their manipulative and coordinated trading; (3) agreeing to limit the use of email in order to avoid creating a record of their manipulative activity; and (4) using fraudulent and fictitious contracts to create the false appearance that payments to the CW and others were for legitimate services to SNRR and other

unrelated companies, when in reality the payments were for their assistance in the manipulation of SNRR stock.

        g.      Using the wires and facilities of interstate and foreign commerce in furtherance of the scheme.

      20.      In or about Fall 2008, defendant FRANK MORELLI, Person No. 1, Person No. 2 and Person No. 4 purchased a publicly traded company in order to use it in a future stock manipulation and changed its name to SNRR.

      21.      On or about February 26, 2009, during a telephone call, defendant FRANK MORELLI and the CW discussed: (a) using an associate of the CW who would, in exchange for a fee, cause a buying group to purchase stock in companies designated by defendant MORELLI at times set by defendant MORELLI and others working with him; and (b) promoting the stock by having a representative of the company that they were promoting appear as a guest on a radio or television show hosted by Person No. 7, who wanted to be paid in cash and preferred stock for hosting the company representative.

      22.      On or about March 23, 2009, defendant FRANK MORELLI, Person No. 5, Person No. 6, Person No. 9, the CW, and another person known to the United States Attorney met at a hotel restaurant in Philadelphia, Pennsylvania to discuss plans to manipulate the volume and price of SNRR stock by merging Greenlink Interactive, a sole proprietorship owned by Person No. 3, into SNRR, a public company that had few assets and was not profitable.

      23.      On or about March 23, 2009, at the meeting described in paragraph 22, defendant FRANK MORELLI, Person No. 5, Person No. 6, Person No. 9, and the CW also discussed:  (a) obtaining free trading stock through debt conversion; (b) having the CW's associate engage in prearranged trades of SNRR stock for a fee at prearranged times and prices;

(c) starting the trading of SNRR stock at $0.40 or $0.50 per share; (d) increasing the price of

SNRR stock to $1.50 per share; and (e) paying Person No. 7 to host Person No. 3 on Person No.

7's radio program in order to increase the trading volume of SNRR stock and justify this increase

to the SEC.

   24. On or about March 23, 2009, at the meeting described in paragraphs 22

and 23, defendant FRANK MORELLI, Person No. 5, Person No. 6, Person No. 9, and the CW

also discussed the need to move slowly and in a coordinated manner in order to avoid losing

control of the manipulation and to avoid detection of the scheme by the SEC.  They agreed to use

different brokers to avoid raising the suspicion of the SEC, and to exercise care not to increase

the price of SNRR stock too rapidly because quick increases in price could raise SEC scrutiny.

Defendant MORELLI said that he did not want to see press releases before they were issued to

the public because if he did see them, it would look like there had been collusion in the event of

an investigation.  Person No. 9 stated that caution was necessary because "I can't spend money

from jail," and Person No. 6 noted that you can "spend money at the commissary."

   25. On or about March 23, 2009, at the meeting described in paragraphs 22

through 24, Person No. 3 participated in part of the meeting remotely from another state, and

explained that his business, Greenlink Interactive, manufactured kiosks for stores that allowed

customers to communicate by video conferencing with a call center staffed by trained

representatives using the company's proprietary technology.

   26. On or about April 21, 2009, defendant FRANK MORELLI, Person No. 1,

Person No. 2, Person No. 3, and Person No. 4 caused SNRR to acquire the assets of Greenlink

Interactive from Person No. 3 in exchange for most of SNRR's shares.

27.     On or about April 26, 2009, during a telephone call, the CW told Person No. 5 that the CW's associate was ready to start buying SNRR stock, and that if the stock was offered at a low offer price, his associate could purchase $5,000 to $10,000 of SNRR stock, which would allow the CW's associate to pay his brokers and analysts.  The CW also told Person No. 5 that leftover funds would be used to pay Person No. 7 for radio and television appearances so that the rest of the "campaign" could begin.  Person No. 5 told the CW that he liked the plan.

28.     On or about April 26, 2009, during the telephone conversation described in paragraph 27, Person No. 5 told the CW that that the group had done the financials and was "psyched" to proceed with the SNRR deal, and that Person No. 5 wanted to use three different brokers to sell the stock.  Person No. 5 assured the CW that the group would do things "professionally."  Person No. 5 agreed with the CW's suggestion that they set the price of SNRR stock at about 50 cents per share.

29.     On or about April 27, 2009, during a telephone conversation, the CW told Person No. 7 that the SNRR Group was close to beginning its campaign, that the CW would execute a trade with other participants in order to obtain cash for Person No. 7 to pay him for hosting an SNRR representative on his show, and that the CW would also obtain SNRR stock for Person No. 7, which he could then sell into the market.  Person No. 7 responded that if the SNRR Group paid him $10,000 to $15,000 in cash, he would take the remaining payment in restricted stock.

30.     On or about April 27, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused 13,000,000 shares of SNRR common stock to be conveyed to Person No. 3 as payment for Greenlink Interactive's purported assets.  At this time, Greenlink Interactive became a division of SNRR.

9

31.     On or about May 1, 2009, during a conference call, defendant FRANK MORELLI introduced the CW to Person No. 1 and Person No. 2, and referred to them as the "main players" in the SNRR deal.  The CW said that he wanted Person No. 7 to put SNRR on television and radio, which would cost cash and stock.  The CW explained that he had to pay a 15 to 20 percent fee to his "guy" who worked with brokers and hedge funds that were willing to buy stock at the "guy's" direction.  The CW explained that the SNRR Group could use cash from the stock sales to pay Person No. 7 and to put out mailings and emails, and that he had another "guy" in Philadelphia who also had a buying program.

32.     On or about May 1, 2009, during the conference call described in paragraph 31, Person No. 1 stated that the group did not have the funds for mailers, and that he would rather be careful, "start out slow, and . . . walk before [they] run."  Person No. 1 and Person No. 2 agreed that the CW's buyer would purchase $10,000 to $20,000 of SNRR stock for a 15 percent fee and that the rest of the money would be used to pay Person No. 7.

33.     On or about May 5, 2009, during a conference call, defendant FRANK MORELLI, Person No. 1, Person No. 2, and the CW agreed that the CW would have the CW's buyer purchase SNRR stock at an agreed upon price from someone in the SNRR Group.  They also agreed that the group would then send the proceeds to the CW, who would use the money to pay the CW's buyer and Person No. 7, as well as Person No. 9, whom Person No. 1 stated he knew well.

34.     On or about May 5, 2009, during the conference call described in paragraph 33, Person No. 1 noted that: (a) he had buying groups in New York and Beverly Hills that he could bring in to assist with the scheme; (b) Person No. 3 was his friend; (c) participants in the SNRR deal would not put a lot of stock in the market at once, but would see how things

10

progressed; and (d) things would "work beautifully."  The CW explained that he would start out with a small purchase to show what the CW's buyer could do, and that they needed to move slowly to avoid drawing SEC attention, after which Person No. 1 stated that the SEC are "pussies."

35.     On or about May 14, 2009, during a conference call with defendant FRANK MORELLI, Person No. 2, and the CW, Person No. 1 said that he did not want to speak with the CW's buyer because Person No. 1 needed to protect his crew.  Person No. 1 directed the CW to open brokerage accounts with two different brokerage firms so that all of the SNRR stock was not coming from one place.

36.     On or about May 14, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter to SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to Person No. 4's firm, Starr Consulting, which the firm then transferred to entities controlled by defendant MORELLI, Person No. 1, Person No. 2, Person No. 4, and Person No. 10, could be converted to free trading stock, knowing that this letter was based on false and misleading information, including a statement that Person No. 3, who owned approximately 76 percent of the stock at that time, was not an "affiliate" of SNRR.  The term "affiliate" refers to individuals or entities in positions of authority or control in a corporation, including officers, directors, and major shareholders.

37.     On or about May 15, 2009, Person No. 3 and Person No. 4 caused a document titled "Initial Company Information and Disclosure Statement" to be filed with the SEC.  The document contained misleading statements concerning SNRR's business, including statements that SNRR had contracts with numerous businesses without disclosing that the vast

11

majority of those businesses were other companies owned by or associated with Person No. 3's brother.

38.     On or about May 18, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately six million free trading shares of SNRR common stock to be issued to entities under the control of and/or associated with defendant MORELLI, Person No. 1, Person No. 2, Person No. 4, and Person No. 10.  The six million free trading shares arose from the conversion of approximately $6,000 of debt allegedly owed by SNRR to Person No. 3.

39.     On or about May 21, 2009, during a telephone conversation, defendant FRANK MORELLI told the CW that the CW would be purchasing stock in SNRR from somebody "friendly."

40.     On or about May 21, 2009, during telephone conversations, the CW explained to Person No. 4 that the CW needed his 250,000 shares of SNRR stock issued to the CW's company, and asked Person No. 4 if the shares should be split between two brokerage houses, to which Person No. 4 stated that he did not want to turn in too many stock certificates at one time.  Person No. 4 agreed that he would tell defendant FRANK MORELLI to give the CW a shareholder list of SNRR stockholders that the CW's associates had requested.  Such lists typically are not available to the public and are valuable to participants in stock manipulation schemes to keep track of who owns the stock at any given time and identify who held, purchased, sold, or otherwise disposed of the stock.

41.     On or about May 26, 2009, during a conference call with defendant FRANK MORELLI and the CW, Person No. 1 said that he needed "to get some volume going" and would give 250,000 SNRR shares to the CW, but they could not begin immediately because

there was no stock in the system.  After the CW repeated the plan for the prearranged trade with

his associate, Person No. 1 said that a press release would be issued the next day, with several

other press releases to follow.

    42. On or about May 27, 2009, during a conference call among defendant

FRANK MORELLI, Person No. 3, and the CW, Person No. 3 said that he and Person No. 1 had

agreed that Person No. 7 would provide only a television and radio appearance and they would

not use Person No. 7's buying group at that time.  After Person No. 3 exited the call, defendant

MORELLI told the CW that defendant MORELLI wanted the CW to do the prearranged trade of

SNRR stock with Person No. 1.

    43. On or about May 28, 2009, defendant FRANK MORELLI, Person No. 1,

Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter to

SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to

Starr Consulting, which the firm then transferred to individuals and entities, could be converted

to free trading stock, knowing that this letter was based on false and misleading information,

including a statement that Person No. 3, who owned approximately 56 percent of the stock at that

time, was not an "affiliate" of SNRR.

    44. On or about May 28, 2009, the SNRR Group caused SNNR to issue a

press release titled "Super Nova Resources Building on Years of Development," announcing

SNRR's acquisition of Greenlink Interactive and introducing a new management team.

    45. On or about May 28, 2009, during a telephone conversation, Person No. 1

told the CW that (a) the SNRR Group had issued SNRR's first press release; (b) Person No. 1

would be the one arranging the sale of $10,000 to $20,000 of SNRR stock from the SNRR

Group's seller to the CW's buyer; and (c) the SNRR Group would then send the proceeds to the

CW so that the CW could use the cash to pay Person No. 7 and Person No. 9 for their anticipated services promoting SNRR stock.

46.    On or about May 28, 2009, during another telephone conversation, Person No. 1 notified the CW that Person No. 1 was in the market offering to sell 30,000 shares of SNRR stock for 43 cents per share, and told the CW that the sale could be postponed to the next day if necessary.

47.    On or about May 28, 2009, during another telephone conversation, Person No. 1 asked the CW if the CW had done anything to cause the CW's buyer to purchase the SNRR stock.  The CW responded that he would arrange the sale after he spoke to his buyer, and that the CW would send Person No. 1 instructions as to where to wire money that the CW would need to pay the CW's buyer, Person No. 7, and Person No. 9.

48.    On or about June 1, 2009, at approximately 10:29 a.m., during a telephone call, Person No. 1 told the CW that he was waiting for his broker's compliance department to clear stock for sale to the CW's associate.  The CW told Person No. 1 that the CW's associate was ready to purchase 30,000 shares of SNRR stock, and that the CW would provide instructions so that Person No. 1 could wire payment to the CW to enable the CW to pay the CW's associate, Person No. 7, and Person No. 9.

49.    On or about June 1, 2009, at approximately 10:35 a.m., during a telephone call, Person No. 3 informed the CW that Person No. 11 was going to appear on Person No. 7's show, and that they could do investor relations in conjunction with the appearance.  Person No. 3 agreed that the CW should purchase stock from the SNRR Group and receive payment from the group to pay Person No. 7 for promoting SNRR on his show.

14

50.     On or about June 1, 2009, at approximately 11:15 a.m., during a telephone call, Person No. 1 told the CW that 50,000 shares of SNRR stock were available at 43 cents per share, and instructed the CW to buy them.  Following this conversation, the FBI, acting undercover, purchased 30,000 shares of SNRR stock for $12,900 from an account in the name of Horizon Capital, a company controlled by Person No. 1 and Person No. 2.  Prior to the purchase by the FBI, less than 2,000 SNRR shares had been traded between March 1, 2009 and June 1, 2009.

51.     On or about June 1, 2009, at approximately 1:27 a.m., during a telephone call, the CW told Person No. 1 that the CW's associate had purchased 30,000 shares of SNRR stock, and the CW needed to send Person No. 1 instructions for wiring the funds used for the purchase back to the CW.  Person No. 1 told the CW that Person No. 3 and the CW needed to put together headlines because they were "on the cusp . . . of just rocking this thing."

52.     On or about June 3, 2009, during a conference call, the CW told defendant FRANK MORELLI and Person No. 2 that the CW's associate had purchased 30,000 shares of SNRR stock and was willing to purchase more, but needed payment.  Person No. 2 provided the CW with a fax number to send the wiring instructions.  Person No. 2 also agreed that the CW should bring in Person No. 7's buying group.  When the CW said that people would get paid to purchase SNRR stock, Person No. 2 said that defendant MORELLI would handle that side of the transactions.

53.     On or about June 3, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately 13,450,000 free trading shares of SNRR common stock to be issued to the CW's entity, Person No. 5, and individuals and entities under the control of and/or associated with defendant MORELLI, Person No. 1,

Person No. 2, Person No. 3, Person No. 4, and Person No. 10.  The 13,450,000 free trading

shares arose from the conversion of approximately $13,450 of debt allegedly owed by SNRR to

Person No. 3.

        54.     On or about June 4, 2009, the SNRR Group caused SNRR to issue a press

release stating that Person No. 11 would be interviewed that day on Person No. 7's program,

which would be aired the following day on stations that reached "nearly 30,000,000 people

throughout the world."

        55.     On or about June 4, 2009, the CW sent an email to Person No. 1, which

included wiring instructions for money due to the CW for the June 1 prearranged trade, and

explained that the CW wanted to pay "Chuck," the CW's buyer, Person No. 7, and Person No. 9.

        56.     On or about June 4, 2009, Person No. 1 sent a return email to the CW

stating that Person No. 1 did not know anything about "Chuck," and claiming that he did not

want to be involved in any prearranged transactions because they were illegal.  Person No. 1 also

said that the CW must have meant buying more shares with "Chuck" through the company.

        57.     On or about June 5, 2009, during a conference call, Person No. 1

complained to defendant FRANK MORELLI and the CW about the CW's June 4 email,

explaining that a friend of his had been indicted for getting paid to buy stock in a deal, and

stated:  "[E]mails and sh** like that aren't cool with me, dude.  I f***ing . . . will about face and

run the other way."  After the CW promised not to send any more emails, defendant MORELLI,

Person No. 1, and the CW discussed Person No. 11's interview on Person No. 7's show, and also

discussed whether Person No. 1 wanted to bring in Person No. 7's buying group.  Person No. 1

told the CW to bring in Person No. 7's buying group.

58.     On or about June 5, 2009, during a telephone conversation with the CW, Person No. 7 discussed his interview with Person No. 11.  Person No. 7 said that he had spoken to Person No. 3 and advised Person No. 3 to start using press releases and phone calls in conjunction with the broadcast because "this stuff works really well."  According to Person No. 7, Person No. 3 had also confirmed that the CW would pay Person No. 7 for the interview about SNRR on his program, and that Person No. 7 would bring in a buying group that would purchase a minimum of $50,000 of SNRR stock.  Person No. 7 explained to the CW that Person No. 7 could not sell or touch the stock until he was done talking about it on his show, but would email the CW the name in which the stock should be issued to Person No. 7.

59.     On or about June 5, 2009, the interview that Person No. 7 conducted on June 4, 2009 with Person No. 11 regarding SNRR was aired on Person No. 7's show.

60.     On or about June 7, 2009, during a conference call, Person No. 3 told defendant FRANK MORELLI and the CW that he would send drafts of news releases to the CW.  Person No. 3 also said that Person No. 11 would be appearing again on one of Person No. 7's shows to support what the CW and others were doing for SNRR.

61.     On or about June 8, 2009, defendant FRANK MORELLI caused a relative to email three draft press releases to Person No. 3, Person No. 11, and the CW, and instructed the CW to respond directly to Person No. 3.  Two of the three press releases were issued on July 1, 2009 and July 13, 2009.

62.     On or about June 9, 2009, during a telephone conversation, Person No. 4 told the CW that defendant FRANK MORELLI said that the SNRR Group would wire money to Person No. 4 so that Person No. 4 could wire it to the CW, and that the CW needed shareholder lists for SNRR.  Person No. 4 told the CW that in order to send the CW money, the CW would

17

need a contract, and that Person No. 4 was waiting to see how much money Person No. 2 was sending Person No. 4 to pay the CW so that Person No. 4 could draft the contract.  The CW told Person No. 4 that he needed to pay the CW's buying group as well as Person No. 7 and Person No. 9, and that he also needed a block of stock to give Person No. 7.   During the conversation, Person No. 4 told the CW that the deal should be a "home run" for all of them.

63.    On or about June 11, 2009, during a telephone call with defendant FRANK MORELLI, Person No. 2, and the CW, Person No. 1 told the CW that they would be trading SNRR stock the next day, and that Person No. 1 would let the CW know if he should release news.

64.    On or about June 15, 2009, during a telephone conversation, the CW told defendant FRANK MORELLI that the CW was concerned that he could not issue press releases since the CW had free trading stock and it would look like he was "in the loop."  Defendant MORELLI told the CW that they were having problems with one of the brokers, but they had great news to release, the deal was going "to rock," and they could take SNRR stock to $1.00 per share.  Defendant MORELLI also told the CW that Person No. 1 was supposed to pay the CW.

65.    On or about June 15, 2009, during a conference call with Person No. 1 and the CW, defendant FRANK MORELLI told the CW that they were changing brokers because the broker that they were using had not wired the money for payment to the CW.  Person No. 1 asked about press releases that Person No. 3 was supposed to have sent the CW, and when the CW described them as "weak," Person No. 1 instructed the CW to make sure that at least one news release mentioned a well-known retailer such as Home Depot or Starbucks.  Person No. 1 also stated that the prearranged trade of SNRR stock had just been "printed" (or publicly recorded).

66. On or about June 17, 2009, Person No. 1 and Person No. 2 received proceeds for the sale of 65,000 shares of SNRR stock in the amount of approximately $23,468 through Horizon Capital, a company under their control.

67. On or about June 23, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter to SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to Starr Consulting, which the firm then transferred to Person No. 7 and certain entities, could be converted to free trading stock, knowing that this letter was based on false and misleading information, including a statement that Person No. 3, who owned approximately 28 percent of SNRR stock at that time, was not an "affiliate" of SNRR.

68. On or about June 24, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately 10,700,000 free trading shares of SNRR common stock to be issued to Person No. 7 and entities under the control of and/or associated with defendant MORELLI, Person No. 1, Person No. 2, Person No. 3, Person No. 4, and Person No. 10. The 10,700,000 free trading shares arose from the conversion of approximately $10,700 of debt allegedly owed by SNRR to Person No. 3.

69. On or about June 24, 2009, during a telephone conversation, defendant FRANK MORELLI, who was with Person No. 1 and Person No. 2, told the CW that they should be able to wire the CW money in the near future, and instructed the CW to open an account at Brokerage Firm B.

70. From in or about June 2009 through in or about September 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 4, Person No. 5, Person

No. 6, Person No. 7, and Person No. 10 and/or entities under their ownership or control opened brokerage accounts at Brokerage Firm C.

71.     On or about July 1, 2009, SNRR issued a press release via Marketwire announcing that after successful trials in retail environments, SNRR subsidiary Greenlink Interactive would begin manufacturing its next generation PODS.

72.     From on or about July 1, 2009 through on or about July 7, 2009, approximately 705,200 shares of SNRR stocks were traded.  Only approximately 190,000 shares of SNRR stock had been sold in the open market on a total of 11 trading days between January 1, 2009 and July 1, 2009.  Other than those 11 days, no shares of SNRR stock had traded on the open market during that period of time.

73.     On or about July 8, 2009, during a telephone conversation, Person No. 3, in response to a comment by the CW that it appeared that someone was trading SNRR stock, stated that they had a few deals working in which they needed to keep the stock moving, so they were doing some trading.

74.     On or about July 9, 2009, during a telephone conversation, defendant FRANK MORELLI discussed with the CW that the CW's shares of SNRR were returned to Person No. 3.  Defendant MORELLI told the CW that he needed to contact Person No. 1 about the money owed to the CW.

75.     On or about July 13, 2009, SNRR issued a press release via Marketwire stating that SNRR subsidiary Greenlink Interactive would soon be announcing brand and venture partners for the rollout of PODS, and identified HK Retail as the company's "strategic partner."

76.     On or about July 14, 2009, SNRR issued a press release via Marketwire stating that SNRR subsidiary Greenlink Interactive was well positioned in the trillion dollar kiosk industry.

77.     On or about July 14, 2009, during a telephone conversation, Person No. 1 complained to the CW that someone was "back dooring" him on the SNRR deal, and told the CW that he was having problems with "that money we created," referring to the FBI's purchase of SNRR shares on June 1, 2009.  Person No. 1 promised the CW that once he resolved the issue, he would take care of the CW and the CW's associates.  Person No. 1 also told the CW that the group had moved 1.2 or 1.5 million shares last week "back and forth," and had done some other things that they needed to do.  Approximately 1.3 million SNRR shares traded on the open market between July 1, 2009 and July 13, 2009.  Many of these trades were coordinated among members of the SNRR Group in order to create the false appearance of market interest in SNRR stock.

78.     On or about July 16, 2009, during a telephone conversation, Person No. 4 told the CW that defendant FRANK MORELLI wanted to send the CW 250,000 shares of stock but was unable to do so because the CW did not have an account at Brokerage Firm A.  Person No. 4 agreed to send the CW the paperwork to open an account there.

79.     On or about July 17, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter to SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to Starr Consulting, which the firm then transferred to an individual and an entity, could be converted to free trading stock, knowing that this letter was based on false and misleading

information, including a statement that Person No. 3, who owned approximately 23 percent of SNRR stock at that time, was not an "affiliate" of SNRR.

80.    On or about July 22, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately 10,000,000 free trading shares of SNRR common stock to be issued to an entity under the control of and/or associated with Person No. 1 and a relative of defendant MORELLI.  The 10,000,000 free trading shares arose from the conversion of approximately $10,000 of debt allegedly owed by SNRR to Person No. 3.

81.    On or about July 22, 2009, during a telephone conversation, defendant FRANK MORELLI told the CW that Person No. 4 had sent SNRR's shareholder list to Person No. 1 and Person No. 2, and that the group would be bringing in Person No. 7's buying group.

82.    On or about July 22, 2009, during a telephone conversation, Person No. 8 of Brokerage Firm A told the CW that if three or four of the accounts were selling SNRR stock through his brokerage firm, he could give each person the average price, and the CW agreed that since everyone was working together, using an average figure would be best.

83.    On or about July 31, 2009, Person No. 3 caused SNRR to issue a press release stating that it would soon announce a major technology partner for its PODS.

84.    On or about August 3, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  The press release announced that SNRR subsidiary Greenlink Interactive had entered into a joint venture with Sovereign Card Services.

85.    On or about August 4, 2009, Person No. 3 caused SNRR to issue two press releases, which described him as the Chief Executive Officer of SNRR, via Marketwire:

(a) a press release titled "Super Nova Resources and View Systems Announce a Strategic Technology Partnership," claiming that the partnership would allow PODS, which would be used in high traffic retail locations, "to recognize individuals and personalize their interface experience to their specific preferences"; and (b) a press release titled "Grass Roots Research, Inc. Initiates Coverage of Super Nova Resources Inc. With a Buy Recommendation."  The second press release linked to a research report prepared by Grass Roots Research, which included a misleading statement that Person No. 3 had spent $14 million on Greenlink Interactive's technology.

        86.     On or about August 6, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  This press release, titled "Super Nova Resources and Early Detect to Develop Health Care PODS for Mass Market Education and Distribution," announced a joint venture with Early Detect, Inc. to develop PODS that would be used in retail locations "to educate people about the importance of preventative wellness and more importantly 'early detection' of illnesses and vend the test kits when applicable."  The press release was the fifth press release issued in the five trading days between July 31, 2009 and August 6, 2009.  During this time period approximately 7,000,000 SNRR shares were traded, which was approximately 50 times more than the 140,000 shares traded on the five previous trading days.

        87.     On or about August 12, 2009, Person No. 1 and Person No. 2, through entities they controlled, completed sales of at least 2,935,000 shares of SNRR stock that they had begun selling on June 23, 2009, for proceeds totaling approximately $443,453.

        88.     On or about August 13, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter

to SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to Starr Consulting, which the firm then transferred to certain individuals and entities, could be converted to free trading stock, knowing that this letter was based on false and misleading information, including statements that Person No. 3, who owned approximately 18 percent of SNRR stock at that time, was neither an "affiliate" nor an officer of SNRR.

89.     On or about August 17, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately 37,700,000 free trading shares of SNRR common stock to be issued to Person No. 5 and individuals and entities under the control of and/or associated with defendant MORELLI, Person No. 1, Person No. 2, Person No. 3, Person No. 4, Person No. 6, and Person No. 10.  The 37,700,000 free trading shares arose from the conversion of approximately $37,700 of debt allegedly owed by SNRR to Person No. 3.

90.     On or about August 19, 2009, Person No. 5 completed sales of approximately 1,500,000 shares of SNRR stock that he began selling on or about July 31, 2009 for proceeds of approximately $124,592.

91.     On or about August 21, 2009, during a telephone conversation, defendant FRANK MORELLI instructed the CW not to say anything in emails about his associate buying stock.  Defendant MORELLI also told the CW that Person No. 4 would get the CW a consulting contract falsely stating that the contract was for investor relation services and was unrelated to CW's associate who had purchased SNRR stock.

92.     On or about August 21, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  The press release, titled "Super Nova Resources - Greenlink Interactive Has Developed a LIVE Entertainment Platform," stated that the company had "developed a LIVE Interactive global

24

entertainment platform that will allow contestants from all over the world to compete in talent competitions such as:  Karaoke, Comedy, Acting, Dance and much more."  Trading volume of SNRR stock this day increased to approximately 18,732,631 shares, and the closing price increased to $0.045 per share, up from approximately 1,550,133 shares and a closing price of $0.032 per share the previous trading day.

93.     On or about August 24, 2009, Person No. 3 caused SNRR to issue a misleading press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  The press release, titled "Super Nova Resources Announces Strategic Partnership," announced the completion of a strategic partnership with the Symplx Group, which partnership was created to give SNRR subsidiary Greenlink Interactive access to "60,000,000 products and to consolidate drop shipping worldwide."  The press release also falsely named numerous well known retailers that were purportedly part of the Symplx network.  SNRR stock was named one of the five most promoted stocks of the day on a website specializing in small cap stocks.

94.     On or about August 24, 2009, an entity owned and/or controlled by or associated with Person No. 1 and Person No. 2 completed sales of at least 1,500,000 shares of SNRR stock that it had begun selling on July 2, 2009 for proceeds of approximately $42,930.

95.     On or about August 24, 2009, Person No. 7 completed sales of 1,500,000 shares of SNRR stock that he had begun selling on August 3, 2009, for proceeds of approximately $133,770.

96.     On or about August 25, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  The press release announced a conference call scheduled for September 18, 2009 for the purpose of announcing SNRR's "amazing progress."

25

97.     On or about August 25, 2009, Person No. 4 caused Person No. 10 to send the CW a notice of conversion providing for the conversion of $2,000 of debt from SNRR to Person No. 3 into two million shares of SNRR stock in the name of the CW's entity.  Person No. 10 also forwarded the CW a consulting agreement which stated that the SNRR shares were payment for providing public relations and corporate communications services, although the shares were actually compensation for participating in the June 1, 2009 prearranged trade.

98.     On or about August 26, 2009, during two telephone calls, defendant FRANK MORELLI asked the CW to sign the consulting agreement so that the CW could get SNRR stock, which defendant MORELLI said the CW should just "cash out."  Defendant MORELLI explained that the CW would be well compensated, and should take care of his associate, but that defendant MORELLI did not need to know anything else.

99.     On or about August 27, 2009, Person No. 4 re-sent the consulting contract to the CW, and warned the CW that if the contract was not returned immediately, he would have to wait for the next conversion of debt into free trading stock because the documents were being submitted to the attorney that day.

100.    On or about August 28, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused an attorney to provide an opinion letter to SNRR's stock transfer agent stating that the convertible debt that Person No. 3 had transferred to Starr Consulting, which the firm then transferred to certain individuals and entities, could be converted to free trading stock, knowing that this letter was based on false and misleading information, including statements that Person No. 3, who owned approximately 12 percent of SNRR stock at that time, was neither an "affiliate" nor an officer of SNRR.

101.    On or about August 31, 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 3, and Person No. 4 caused approximately 29,800,000 free trading shares of SNRR common stock to be issued to individuals and entities under the control of and/or associated with defendant MORELLI, Person No. 1, Person No. 2, Person No. 3, Person No. 4, and Person No. 10.  The 29,800,000 free trading shares arose from the conversion of approximately $29,800 of debt allegedly owed by SNRR to Person No. 3.

102.    On or about September 3, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the President and Chief Executive Officer of SNRR, via Marketwire.  The press release described a call with investors in which Person No. 3 discussed the progress of SNRR subsidiary Greenlink Interactive, "including [its] relationships with major retailers, celebrities and vendors."

103.    On or about September 3, 2009, Person No. 10 completed sales of approximately 4,100,000 shares of SNRR stock that he began selling on August 19, 2009, for proceeds of approximately $107,358.

104.    On or about September 4, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire. The press release announced that SNRR was working on a partnership agreement with a prominent celebrity who is a regular guest on a top ranked national radio show, who would help SNRR "introduce its technology to the world."  More than 24,700,000 shares of SNRR were traded on this day, up from 3,307,330 shares the previous day.

105.    On or about September 4, 2009, individuals and entities associated with defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 4, and Person No. 10

27

completed selling approximately 23,380,500 shares of SNRR stock that they had begun selling on July 6, 2009 for proceeds of approximately $977,643.

106.    On or about September 5, 2009, during a telephone conversation, the CW asked defendant FRANK MORELLI if anything was going on with SNRR, or whether the CW should just sell his stock and pay the bills.  Defendant MORELLI told the CW to just pay the bills.

107.    On or about September 10, 2009, after the SEC suspended trading in SNRR stock on September 8, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire.  The press release, titled "Super Nova Resources, Inc. Addresses Suspension," quotes Person No. 3 as stating that the suspension caught SNRR by surprise, and that SNRR was "working diligently to satisfy the concerns of the proper authorities."

108.    On or about September 10, 2009, during a telephone conversation, Person No. 4 explained to the CW that the reason that the CW did not receive his shares of SNRR stock was because he was late getting in the paperwork needed for the previous opinion letter and, therefore, the CW could not be issued free trading stock.  Person No. 4 told the CW that he could get stock the next time that it was issued, and that they were going to file an SEC form that would allow SNRR stock to be quoted.

109.    On or about September 17, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire. The press release, titled "Super Nova Resources, Inc. Announces LIVE Conference Call Rescheduled," stated that the company rescheduled its conference call to October 2, 2009, at which time they would provide an update on the company's "amazing progress."

28

110.    On or about September 25, 2009, Person No. 5 sold 1,000,000 shares of SNRR stock for proceeds of $14,245.

111.    On or about September 29, 2009, Person No. 6, through his company Bay State Financial, completed selling approximately 2,250,000 shares of SNRR stock that he began selling on August 25, 2009 for proceeds of approximately $49,040.

112.    On or about October 2, 2009, Person No. 3 caused SNRR to issue a press release, which described him as the Chief Executive Officer of SNRR, via Marketwire. The press release, titled "Super Nova Resources, Inc. Reschedules Conference Call," notified the public that the conference call scheduled for that day was postponed to a date in the "near future," after the company filed the required paperwork. The press release estimated that required paperwork would be filed within ten business days.

113.    On or about October 4, 2009, during a telephone call, defendant FRANK MORELLI told the CW that he and others were trying to get SNRR started again after the SEC had suspended trading in the company, and if this did not happen, defendant MORELLI would pay the CW with stock in something else. Defendant MORELLI assured the CW that he and Person No. 4 would take care of the CW and mentioned that he was working on an oil and gas deal regarding Company Y.

114.    On or about October 6, 2009, during a telephone conversation, defendant FRANK MORELLI told the CW that Person No. 4 was trying to get the CW shares in Company Y, a new company that they were promoting. Defendant MORELLI stated that Person No. 4 could get the CW $25,000 worth of shares in Company Y. Defendant MORELLI added that Company Y had big news, and the price of its stock would double.

115.     On or about October 14, 2009, Person No. 4 sent an email to the CW instructing him to sign three attached documents relating to Company Y:  an agreement to purchase $5,000 of Company Y's convertible debt from Starr Consulting, a promissory note agreeing to pay $6,250 to Starr Consulting, and a notice of conversion electing to convert the debt to 50,000,000 shares of Company Y's common stock.  These documents were designed to make it falsely appear that the CW's entity purchased $5,000 of convertible debt in Company Y from Person No. 4's business, Starr Consulting, for $6,250 and that the CW was converting this debt to 50,000,000 Company Y's shares.

116.     On or about October 23, 2009, during a telephone conversation, the CW complained to Person No. 10 that the contracts received from Person No. 4 required the CW to pay $6,500.  Person No. 10 responded that they would just cancel the underlying promissory note reflecting the CW's obligation to pay the $6,500.

117.     On or about October 29, 2009, during a telephone conversation, defendant FRANK MORELLI told to the CW that defendant MORELLI and Person No. 4 would give the CW the money that the CW was owed for the SNRR deal.  Defendant MORELLI also said that the CW would need to pay $6,500 for debt conversion in the new company, even though the CW had nothing to do with the new company, because the SEC was cracking down and they would need an explanation for the stock transfer.

118.     From in or about June 2009 through in or about October 2009, defendant FRANK MORELLI, Person No. 1, Person No. 2, Person No. 4, Person No. 5, Person No. 6, and Person No. 10, caused individuals and entities under their control and/or with which they were associated to sell approximately 70,894,500 shares of SNRR stock for proceeds of approximately $3,027,297, including but not limited to the following:

| Approximate Dates of Sales | Seller | Related Parties | Approx. Shares Sold | Approx. Proceeds |
|---|---|---|---|---|
| 6/12/09 – 9/4/09 | Horizon Capital | Person No. 1 and Person No. 2 | 6,000,000 | $442,876 |
| 7/2/09 – 8/24/09 | Paradise Holdings | Person No. 1 and Person No. 2 | 1,500,000 | $42,930 |
| 7/7/09 – 9/4/09 | Daniel's Limited, Inc. | Person No. 4 | 4,758,500 | $181,215 |
| 8/19/09 – 9/3/09 | Person No. 10 | Person No. 4 | 4,100,000 | $107,358 |
| 7/6/09 – 9/4/09 | Company X | Person No. 4 | 6,000,000 | $313,477 |
| 7/31/09 – 9/25/09 | Person No. 5 | Person No. 5 | 2,500,000 | $138,837 |
| 8/25/09 – 9/29/09 | Bay State Financial | Person No. 6 | 2,250,000 | $49,040 |
| 8/6/09 – 9/4/09 | Defendant's relative | MORELLI | 6,021,000 | $222,868 |

119.    On or about March 23, 2009, in the Eastern District of Pennsylvania and elsewhere, defendant

**FRANK J. MORELLI, III**,

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate and foreign commerce, that is, they used the internet via website www.webex.com, to communicate between the Eastern District of Pennsylvania and another state, in order to plan their manipulative market activity regarding SNRR stock.

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to this information:

1.     Paragraphs 1 through 17 of Count One are incorporated here.

2.     From in or about at least Fall 2008 through in or about October 2009, defendant

### FRANK J. MORELLI, III

conspired and agreed, with Person No. 1, Person 2, Person No. 3, Person No. 4, Person No. 5, Person No. 6, Person No. 7, Person No. 8, Person No. 9, Person No. 10, and others known and unknown to the United States Attorney, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the SEC in the regulation and monitoring of the purchase and sale of publicly traded securities.

### MANNER AND MEANS

3.     Paragraph 19 of Count One is incorporated here.

### OVERT ACTS

4.     Paragraphs 20 through 118 of Count One are incorporated here.

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to this information:

1.     Paragraphs 1 through 17 and 19 through 118 of Count One are incorporated here.

2.     From in or about at least Fall 2008 through in or about October 2009, in the Eastern District of Pennsylvania and elsewhere, defendant

**FRANK J. MORELLI, III**,

together and with others known and unknown to the United States Attorney, wilfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances and aided and abetted the use and employment of manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of SNRR stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 1343, and Title 15, United States Code, Sections 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, defendant

**FRANK J. MORELLI, III**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds traceable to the commission of such offenses, including, but not limited to, the sum of $3,000,000.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third party;

      (c)      has been placed beyond the jurisdiction of the Court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), and Title 18, United States Code, Section 981(a)(1)(C), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**ZANE DAVID MEMEGER**
**United States Attorney**